# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Submitted on Briefs October 1, 2020

FILED

JAN 4 2021

Clerk of the Appellate Courts
Rec'd by_____

## IN RE JOHN A.

### Appeal from the Juvenile Court for Morgan County
### No. 2019-JV-12   Michael A. Davis, Judge

---

### No. E2020-00449-COA-R3-PT

---

Petitioner Angela Y. brought this action to terminate the parental rights of Melissa V. ("Mother") to her child John A. ("Child").[1]  Petitioner is the sister of Child's father.[2] Petitioner has had custody and taken care of the Child since April 25, 2017, when the Child was a little over one year old.  The trial court terminated Mother's rights on the grounds of abandonment by failure to visit and abandonment by failure to support Child.  We reverse the trial court's finding that Mother abandoned Child by willfully failing to visit.  We affirm the trial court's judgment in all other respects, including the termination of Mother's parental rights.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Reversed in Part and Affirmed in Part; Case Remanded

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Amber R. Clark, Clarkrange, Tennessee, for the appellant, Melissa V.[3]

Jennifer L. Chadwell, Oak Ridge, Tennessee, for the appellee, Angela Y.

---

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights, in order to protect their privacy and identities.

[2] The father's parental rights were terminated by default judgment, and he has not appealed.

[3] Mother's counsel on appeal did not have any involvement in her representation at the trial level.

1

## OPINION

## I. BACKGROUND

Child was born in December of 2015. Mother and Child lived with Petitioner from December of 2016 until April 25, 2017. On that date, Petitioner, acting pro se, filed a petition for emergency custody of Child, which the juvenile court[4] granted the same day. The court did not make a finding of dependency and neglect in its order granting temporary custody to Petitioner. Its only findings noted "allegations that natural mother unable to care for child and abandons child frequently, father unable to care for child due to working out of town and other circumstances." The proof in the record does not reflect what Mother was doing or where she was living at the time the petition for emergency custody was filed. Mother was not served with a copy of the petition.

A hearing took place on May 17, 2017. Mother, unaware of the hearing, did not attend. There is no transcript. The juvenile court entered an order requiring a home study on Petitioner's home. The only finding in the order states, "[p]robable cause exists for removal of child from natural parents." The court also appointed Judith Whitfield as Child's guardian ad litem. On June 19, 2017, the Department of Children's Services ("DCS") filed its home study report. On July 19, 2017, the juvenile court entered an order stating only, "custody remains with [Petitioner]. GAL Judith Whitfield is relieved of responsibility."

In June of 2017 (the precise date is not in the record), Mother turned herself in on an outstanding arrest warrant and was incarcerated. She testified that she was in jail "a little under four months." While Mother was incarcerated, Petitioner successfully filed for an order of protection against Mother.[5] Mother was served in jail with notice of the protective order, but she was not notified of the petition for emergency custody or the juvenile court's orders regarding the petition. The parties testified that the order of protection was entered on June 27, 2017 and expired one year later.

After Mother got out of jail, she went to the juvenile court on September 12, 2017, to seek assistance with custody of Child. At that point, the court clerk gave her a copy of

---

[4] The same juvenile court heard all of the actions pertinent to this case, but Petitioner's petition for emergency custody alleging dependency and neglect initiated a separate action and was assigned a different docket number (2017-JV-67) from that of the current case (2019-JV-12). The record from the dependency and neglect case 2017-JV-67 was placed into evidence in this case as an exhibit.

[5] Neither the petition for order of protection nor the order granting it is in the record. The only proof is the testimony of both Mother and Petitioner that she successfully obtained it. No one testified about the reason Petitioner sought a protective order against Mother while she was incarcerated.

Petitioner's petition for emergency custody. On October 31, 2017, Mother filed a pro se petition for emergency custody of Child, which was assigned another separate docket number. The juvenile court held a hearing on this petition on November 15, 2017. There is no transcript. Mother testified without contradiction that she asked for visitation at the hearing and was denied. The court's order following the hearing does not mention visitation. It states only, "a home study shall be performed on the house and background of [Mother] and report back to the Court." The juvenile court, in separate orders entered the same day, found Mother to be indigent, appointed her counsel, and reappointed attorney Whitfield as guardian ad litem.

On February 7, 2018, DCS filed its home study report of Mother's residence and background. The report noted the following concerns:

[Mother's] current living arrangement in her friend's home with limited space and paying minimal household expenses. Should this arrangement no longer be an option, [Mother] would be without a place to live and possibly unable to pay full living expenses on her own.

[Mother's] income to expense ratio due to paying child support on her other two children.

[Mother's] reliance on others for her transportation needs and does not currently have a valid driver's license.

[Mother's] report of prior counseling and medication for depression, however, no recent evaluation/ treatment.

[Mother's] prior criminal record and current probation status in Morgan County, TN.

The report stated that the "non-custodial home study unit does not make formal recommendations regarding placement," and concluded as follows:

[Mother] appears she is attempting to obtain stability in order to have [Child] returned to her care. However, due to the concerns previously noted, it is unknown if [Mother] has reached full potential in order to be the full-time caregiver for [Child]. However, supervised visitation may be beneficial for [Mother] and [Child] to re-establish their bond should [Mother] continue in her progress.

The parties agree that a hearing took place on March 27, 2018. There is no documentation in the record pertinent to this hearing. Mother appeared and was taken into custody on newly-acquired criminal charges. She testified that she spent about 45 days in jail and was released on or around May 10, 2018. Mother testified that her first court-appointed attorney did not provide her a copy of the DCS home study. She stated that she repeatedly attempted to contact her attorney to encourage him to move forward on her petition for custody, testifying as follows:

> Q: So around May 10, 2018, did you start contacting your attorney about visitation?
>
> A: Yes.
>
> Q: How often would you contact your attorney?
>
> A: At first it was every couple – every couple weeks, and then it got more frequent until I was calling him just about every other day.

Mother testified that she had provided phone records documenting her attempts to call her attorney and that he did not return her calls. She introduced into evidence an email sent to him on June 27, 2018, in which she stated:

> I've called numerous times to your office cell phone and left messages. Short of going up to the judge myself and demanding a new court date I don't know what else to do. This is all seeing to be [*sic*] a ploy to keep my son from me on no grounds whatsoever. I want my child back. I'm going to keep calling and obviously gonna have to harass Morgan county courts to see that what they've done to me is illegal. CALL ME ASAP!! PLEASE

The only document in the record that Mother's first court-appointed attorney filed is his motion to withdraw, which the juvenile court granted on December 19, 2018. The court then appointed new counsel to represent Mother. Mother testified that when she asked the juvenile court clerk "about getting visitation, she said my lawyer is the one that's going to have to ask for it."

Petitioner filed her petition to terminate Mother's parental rights, which initiated the present action, on January 18, 2019. After Mother's second court-appointed counsel withdrew and a third attorney, hired by Mother, entered an appearance, Mother filed an answer. On July 12, 2019, Mother filed a motion to set a trial date and for visitation with Child, asserting that she had a petition for custody pending in the juvenile court since 2017, that she "has not seen [Child] since 2017, and that Petitioner will not allow her visitation."

4

The trial court entered an order on November 18, 2019, ruling on some discovery issues, setting a trial date, and holding that Mother's "Motion for Visitation is denied."

The trial took place on February 4, 2020. The only witnesses were Petitioner and Mother. The trial court found by clear and convincing evidence that Mother abandoned Child by failing to visit and to support him during the period from September 18, 2018 to January 18, 2019. Although the correct four-month statutory period runs from September 18, 2018 to January 17, 2019, this one-day discrepancy makes no difference to our analysis. The trial court further found by clear and convincing evidence that terminating Mother's parental rights was in Child's best interest.

## II. ISSUES

Mother appeals, raising the following issues, as quoted from her brief:

(1) Whether this case violated procedural and substantive due process principles protecting [Mother's] natural, fundamental rights.

(2) Whether grounds for termination were proven by clear and convincing evidence.

(3) Whether Petitioner proved by clear and convincing evidence that terminating Mother's fundamental right to parent was in the best interest of her Child.

## III. STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious

harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de

novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523-24. We give considerable deference to a trial court's findings about witness credibility and the weight of oral testimony, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

## IV. ANALYSIS

### A. Mother's Due Process Rights

Mother argues that the trial court's order terminating her parental rights should be vacated because of the violations of her due process rights in the dependency and neglect case initiated by Petitioner's petition for emergency custody of Child. The juvenile court's disregard of Mother's due process rights in that separate case is disturbing. Custody of Child was removed from Mother without her receiving notice of the proceedings and without a finding of dependency and neglect. As we have already noted, the only factual finding in the trial court's order following the May 17, 2017 hearing states that "[p]robable cause exists for removal of child from natural parents." It appears that all of the proceedings in the dependency and neglect case were conducted before Mother had any notice of the action.

Nevertheless, our Supreme Court, in a case involving a similar due process challenge by a parent who alleged violations of her rights in an earlier dependency and neglect case, set forth the controlling principles of law as follows:

> We . . . decline to address Mother's assertion that she is entitled to relief from the judgment terminating her parental rights based on appointed counsel's inadequate representation in the 2008 dependency and neglect proceeding. Dependency and neglect proceedings are separate and distinct from proceedings to terminate parental rights. *See In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 1, 2004) ("A termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding. It is a new and separate proceeding involving different goals and remedies, different evidentiary standards, and different avenues for appeal."); *In re L.A.J., III*, No. W2007-00926-COA-R3-PT, 2007 WL 3379785, at *6 (Tenn. Ct. App. Nov. 15, 2007) (declining to set aside a termination order based on the failure to appoint counsel for Father in a dependency and neglect proceeding). This appeal arises from and involves only the termination proceeding; therefore, any assertion regarding counsel's

7

allegedly deficient representation in the earlier dependency and neglect proceeding is not properly before us in this appeal.

*In re Carrington H.*, 483 S.W.3d at 536; *see also In re Makenzie P.*, No. W2016-00400-COA-R3-PT, 2016 WL 5851876, at *4 (Tenn. Ct. App. Sept. 30, 2016) ("We find Mother's due process argument unavailing. Mother's appeal is from the order of the chancery court terminating her parental rights, not from the orders of the juvenile court finding her children dependent and neglected or awarding custody to Mr. and Mrs. W").

This Court has also addressed similar due process arguments and held that alleged violations in an earlier dependency and neglect action do not invalidate a trial court's order in a termination action. In *In re Malachi M.*, No. E2020-00561-COA-R3-PT, 2020 WL 6819195, at *5 (Tenn. Ct. App. Nov. 20, 2020), we recently reiterated the following:

> Father also asks this court to vacate the trial court's final order for alleged violations of his due process rights in Malachi's dependency and neglect case. In particular, Father claims that he was not afforded an opportunity to seek court-appointed counsel in the dependency and neglect case. He also asserts that there is no proof that he was properly served with the petition filed by DCS that alleged Malachi was dependent and neglected. Neither of these assertions is persuasive in this case.
>
> Father correctly states that every "parent is entitled to representation by legal counsel at all stages of" a dependency and neglect or termination proceeding. *See* Tenn. Code Ann. § 37-1-126(a)(2)(B). Additionally, Father was not appointed legal counsel until after DCS filed its petition to terminate. There is no proof that indicates Father was afforded counsel in the underlying dependency and neglect case. Nevertheless, this Court has emphasized time and again, "any violation of [a parent's] due process rights . . . that may have occurred at the dependent and neglect proceeding [may be] fully remedied by the procedural protections provided . . . at the termination hearing." *In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003); *see also In re Makenzie P.*, No. W2016-00400-COA-R3-PT, 2016 WL 5851876, at *4 (Tenn. Ct. App. Sept. 30, 2016). Stated differently, a "trial court's decision should not be reversed for any deprivation of due process that occurred at an initial dependency and neglect proceeding when [the parent] was afforded full procedural protection at the termination proceeding." *In re Hoover-Crawford*, No. M2000-01655-COA-R3-CV, 2001 WL 846044, at *5 (Tenn. Ct. App. July 27, 2001).

8

In this parental termination case, Father was afforded the representation of court-appointed counsel before and during trial, and such representation has continued on appeal. The record shows that he was given sufficient notice of the termination proceedings, and he does not argue otherwise. In the absence of any alleged due process violation in *the present termination case*, we hold that any potential violation of his due process rights in the dependency and neglect proceedings has no effect on this Court's authority to address the merits of this appeal.

(Brackets, ellipses and emphasis in original); *see also, e.g.*, *In re Aniston M.*, No. E2015-02076-COA-R3-PT, 2016 WL 2626974, at *3 (Tenn. Ct. App. May 5, 2016) ("A number of Tennessee cases stand for the proposition that dependency and neglect proceedings are separate and distinct from termination proceedings and that violations of a parent's due process rights in a dependency and neglect proceeding are remedied by the procedural protections afforded in termination proceedings.").

In the present case, Mother had notice of this action to terminate her parental rights. She was represented by counsel throughout this case. Consequently, the due process violations in the separate earlier action do not preclude us from reviewing the trial court's decisions in the current termination action.

## B. Grounds for Termination

### 1. Abandonment by Failure to Visit

Tennessee Code Annotated section 36-1-113(g) lists abandonment, as defined in section 36-1-102, as a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2017 & Supp. 2019). At the time the petition was filed, the applicable version of Tenn. Code Ann. § 36-1-102 provided as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either ha[s] failed to visit or ha[s] failed to support or ha[s] failed to make reasonable payments toward the support of the child[.]

Failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). A parent may assert the absence of willfulness, which must be proved by a preponderance of the evidence, as an affirmative defense to abandonment by failure to visit.[6] *Id.* § 36-1-102(1)(I). This Court has explained:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (footnote and citations omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

It is undisputed that Mother failed to visit Child during the relevant four-month period preceding the filing of the termination period. She therefore had the burden of proving by a preponderance of the evidence that her failure to visit was not willful. Tenn. Code Ann. § 36-1-102(1)(I). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640. Mother argues that her failure to visit was not willful because Petitioner's antagonism toward her caused her to believe that Petitioner would thwart her attempts to visit. Mother also argues that her lack of willfulness was demonstrated by her ongoing efforts to seek help from the juvenile court and the legal system to regain custody and visitation of Child.

It is well established in Tennessee that a parent who attempts to visit and maintain relations with his or her child but is thwarted by the acts of others and circumstances beyond the parent's control has not willfully abandoned the child. *In re Adoption of*

---

[6] Although Mother did not raise lack of willfulness as a defense in her answer, she raised it at trial and presented argument and supporting evidence showing her lack of willfulness. Petitioner did not object to this evidence, and the trial court considered it. Petitioner has never argued that Mother waived this defense by failing to raise it in her answer. We conclude that the issue of Mother's willfulness in her failure to visit was tried by implied consent. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *4 n.3 (Tenn. Ct. App. July 22, 2020) (reaching similar conclusion); *In re Brian W.*, No. W2020-00172-COA-R3-PT, 2020 WL 6390132, at *4 n.2 (Tenn. Ct. App. Oct. 30, 2020) (same).

*A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). The Supreme Court further held in *A.M.H.* that "[w]here . . . the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment." *Id.* A couple of years later the Court formulated the test this way: "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009).

A review of the pertinent caselaw bears out the truth of this Court's recent observations that applying this test "is not a mechanical process" and that "courts faced with determining whether a significant restraint has occurred reach different conclusions based on the circumstances of each case." *In re Braelyn S.*, 2020 WL 4200088, at *5 (stating "we simply cannot conclude that Father failed to meet his burden to show a lack of willfulness when, in the face of Mother's significant interference, he made sustained efforts, sometimes vigorous, sometimes more lackluster, in an attempt to maintain a relationship with his child"); *compare In re Justin P.*, No. M2017-01544-COA-R3-PT, 2018 WL 2261187, at *6 (Tenn. Ct. App. May 17, 2018) (no willfulness where "much animosity" between mother and custodian led to "unilateral decision to stop visitation"); *In re Lyric J.*, No. M2014-00806-COA-R3-PT, 2014 WL 7182075, at *6 (Tenn. Ct. App. Dec. 16, 2014) (no willfulness where "Father did not seek custody of Child or try to set up visitation rights before May 2012, but he did try to stay in contact with Child" and was told "it was not a good idea for him to visit"); *In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *9 (Tenn. Ct. App. Nov. 15, 2011) (no willfulness because "the evidence shows an effort on part of the Appellants to interfere with Mother's right to see her child and that, as a result, there was animosity between Mother and the Appellants"); *In re Joseph D.N.*, No. M2009-01353-COA-R3-PT, 2010 WL 744415, at *5 (Tenn. Ct. App. Mar. 3, 2010) (no willfulness where "[t]he proof in this case showed that in order to be able to visit his child, Father would have had to either accede to Mother's onerous conditions, violate a [no-contact] condition of bail, or institute a court proceeding that he could not afford") *with In re Jude M.*, No. E2020-00463-COA-R3-PT, 2020 WL 6233742, at *8 (Tenn. Ct. App. Oct. 22, 2020) (finding willfulness where "although Father was not particularly pleasant or welcoming in response to Mother's occasional requests to visit the Child, he did consistently refer to the visitation requirements of the . . . order and inform Mother that she could visit the Child when she met the requirements"); *In re Gavin G.*, No. M2014-01657-COA-R3-PT, 2015 WL 3882841, at *7 (Tenn. Ct. App. June 23, 2015) (although father resided in a sober living facility with restrictions during four-month period, failure to visit was willful where father "had the ability to request passes to visit others, and he was able to request visitation with Gavin through Mother or the court" and he "left the facility to personally file a motion to reduce his child support obligation" but

11

"did not file a motion requesting visitation"); *In re Kadean T.*, No. M2013-02684-COA-R3-PT, 2014 WL 5511984, at *5 (Tenn. Ct. App. Oct. 31, 2014) (willfulness found where "Mother was never refused visitation or phone calls . . . , she did not request visitation with the child until after the petition to terminate was filed, and . . . the custody order, which required supervised visits, 'made it harder to visit but not impossible'"); *In re Erykah C.*, No. E2012-02278-COA-R3-PT, 2013 WL 1876011, at *6 (Tenn. Ct. App. May 6, 2013) (mother's conduct found willful because "she did not even attempt to visit the Child during the applicable four-month period" and "[n]o evidence was presented that anyone prevented or interfered with Mother visiting the Child").

This Court, following *In re Adoption of A.M.H.*, has held that where a parent was "actively litigating a custody and support petition at the time the petition to terminate his parental rights was filed, . . . [h]is pursuit of a judicial remedy is inconsistent with a finding that he willfully failed to support or visit . . . during the four months immediately preceding the filing of the petition." *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *6 (Tenn. Ct. App. Apr. 27, 2007); *see also In re Braelyn*, 2020 WL 4200088, at *5. On the other hand, we have also recently observed that

> Upon review of the case law on this matter, it is clear that the simple act of filing a petition for visitation or custody does not preclude a finding that the parent had abandoned his or her child by failing to visit the child. The filing of such a petition is, indeed, a relevant factor for the trial court to consider when making its determination concerning whether the parent's failure to visit or support the Child was willful. It, however, is not the only factor to be considered.

*In re Rosylyn W.*, No. E2019-01838-COA-R3-PT, 2020 WL 6053523, at *13 (Tenn. Ct. App. Oct. 13, 2020). In *Rosylyn*, we reviewed precedent establishing that "[w]hile legal action can indicate a party's willfulness to pursue a relationship with a child, a half-hearted or abandoned effort to pursue legal action may not be sufficient to demonstrate a lack of willfulness." *In re Braelyn S.*, 2020 WL 4200088, at *6; *see In re Adoption of Angela E.*, 402 S.W.3d at 642 ("Although Father filed a petition to reinstate his visitation rights, he took no action to advance the petition [and] had no reasonable excuse for failing to pursue the petition to reinstate visitation during those two years" between visitation petition and termination action); *In re Kelsea L.*, No. E2019-00762-COA-R3-PT, 2020 WL 414556, at *4 (Tenn. Ct. App. Jan. 27, 2020) (willful failure to visit where "Father had taken legal action in years past to assert his parenting rights and was familiar with the process for accessing the courts for that purpose, yet he took no action to do so at any time near the four-month period"); *In re Mark A.L.*, No. M2013-00737-COA-R3-PT, 2013 WL 5536801, at *6 (Tenn. Ct. App. Oct. 4, 2013) (although father alleged "he was actively litigating a visitation and support petition," willfulness found because he "did not actively or

continually visit or maintain a relationship with the child at any time"); *In re Erykah C.*, 2013 WL 1876011, at *5-*6 (although "shortly before the four-month period began, [mother] filed a petition in juvenile court seeking the return of the Child and was awaiting a hearing date," she was not actively pursuing the petition because she missed a court date simply because it was raining that day).

In the present case, when Mother finally got notice of Petitioner's initial action and the trial court's removal of Mother's custody in favor of Petitioner, she did what citizens are encouraged and expected to do – she petitioned the juvenile court and tried to get custody back through the legal system. As this Court stated in *In re Chelbie F.*, 2007 WL 1241252, at *7,

> Disputes and disagreements regarding [children's] care and support are often sharp and bitter, and they are among the most sensitive matters that parents, lawyers, and courts must face. When these disputes arise and the parents are unable to resolve them on their own, the parents should be encouraged, rather than discouraged, to seek relief from the courts. In these circumstances, judicial proceedings are preferable to other strategic behavior or self-help that can lead to confrontation, further hard feelings, and other potentially volatile results that are not in the best interest of the children or the parents.

The day of the hearing of Mother's emergency petition to regain custody of Child, November 15, 2017, the juvenile court found Mother to be indigent and appointed her legal counsel. Mother testified that she asked for visitation at that hearing and that the juvenile court denied it. She further testified that the guardian ad litem did not return her phone calls and that when she subsequently went to the court clerk's office to try to pursue visitation, she was led to believe that "my lawyer is the one who's going to have to ask for it."

Mother documented her unsuccessful attempts to contact her first court-appointed attorney and get him to act on her case. Her email, already quoted in full above, reflects her frustration and desperation when she states, "I've called numerous times to your office," "I don't know what else to do," and "I want my child back." As already noted, the only document filed by the first appointed attorney in the record is his motion to withdraw. There is no indication in the record that Mother's second court-appointed attorney filed anything. Under the particular circumstances here, Mother's actions in trying to utilize the legal system to regain custody or visitation cannot fairly be described as "half-hearted" or "abandoned." It appears that despite her relatively limited education and financial resources, she tried as best she could to pursue legal relief.

13

Moreover, the antagonism between Petitioner and Mother is shown both by Petitioner's testimony and her obtaining of an order of protection against Mother while she was in jail. The order of protection expired shortly before the relevant four-month statutory period. But as we stated in *In re Alex B.T.*,

> courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child. . . . Accordingly, this Court may only consider the period between February 8, 2008 and June 8, 2008 to determine if there was a willful failure to visit or support, but may consider prior actions to determine if a failure to visit or support during the relevant period was excused by the actions of others.

2011 WL 5549757, at *6; *accord In re Brookelyn W.*, No. W2014-00850-COA-R3-PT, 2015 WL 1383755, at *9 (Tenn. Ct. App. Mar. 24, 2015) ("events occurring prior to the four-month period may bear on the 'willfulness' of the parent's conduct during the four-month period").

It is clear that the existence of a protective or no-contact order against a parent, in and of itself, may not prevent a finding of willful failure to visit, depending on the circumstances. *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014) ("This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit"); *In re Brian W.*, 2020 WL 6390132, at *4; *In re Hayden L.*, No. E2018-00147-COA-R3-PT, 2018 WL 4190986, at *6 (Tenn. Ct. App. Aug. 31, 2018); *In re Jaylah W.*, 486 S.W.3d 537, 551 (Tenn. Ct. App. 2015). However, the order of protection, granted by the juvenile court at a time when Mother was incarcerated, is relevant to our assessment of the reasonableness of Mother's belief that, as she testified, she thought Petitioner would have her arrested if she contacted Petitioner about visitation. For Petitioner's part, she testified that she was opposed to any visitation by Mother, and "it's fair to say she didn't want [Mother] to have contact with her child." Considering the totality of the particular circumstances in this case, we hold that Mother established by a preponderance of the evidence that her failure to visit was not willful. We reverse the judgment of the trial court finding that this ground was proven.

## 2. Abandonment by Failure to Support

Failure to support occurs when a parent, "for a period of four (4) consecutive months, [fails] to provide monetary support or . . . more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). The relevant statutory four-

14

month period is the same as in the analysis of failure to visit, from September 18, 2018 to January 17, 2019. An adult parent is presumed to know that he or she has a duty to provide support. Tenn. Code Ann. § 36-1-102(1)(H); *In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017). A parent may assert, as an affirmative defense, that the failure to provide financial support was not willful.[7] Tenn. Code Ann. § 36-1-102(1)(I).

Mother testified as follows:

Q: And you've also not paid any child support for [Child] since April 25, 2017?

A: No, ma'am, I have not.

*     *     *

Q: When I took your deposition I asked you if, during the end of 2018 and the beginning of 2019, you had had enough money to have paid child support for [Child], and you had said yes; is that correct?

A: That I would have had enough?

Q: Uh-huh.

A: I would have had enough to pay some, yes. But after paying $400 for my other two [children], it probably wouldn't have been that much.

Q: But you didn't pay anything?

A: No.

Mother was employed during the relevant four months. She knew Petitioner's address. The only reason she gave at trial for not paying support was "even if I thought I could send something to [Petitioner], I honestly believe that she probably wouldn't have given it to [Child]." Even if this theory were relevant to the applicable statutory analysis, which it is not, Mother never tested it by trying to send Petitioner any support. Her

---

[7] Although Mother did not raise lack of willfulness as a defense in her answer, she raised it at trial and presented argument and supporting evidence showing her lack of willfulness. Petitioner did not object to this evidence, and the trial court considered it. Petitioner has never argued that Mother waived this defense by failing to raise it in her answer. We conclude that the issue of Mother's willfulness in her failure to support was tried by implied consent, as we did in our earlier analysis of the failure to visit defense at footnote 6 herein.

testimony and argument hints at the suggestion that she had only enough money to send very little to support Child, but the legislature has directly addressed this contention by stating as follows: "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D).

The trial court found as follows in pertinent part:

> [Mother] made no attempts to pay any form of support for the minor child during the statutory time period of September 18, 2018 to January 1[7], 2019. Additionally, [Mother] made no attempt to pay any support for the minor child since April 27, 2017. During the statutory time period, [Mother] was employed. [Mother] testified that during the statutory time period, she would have been able to pay some form of support for the minor child, even though it may have been a small amount. . . . [Mother] had the resources based on her income and her expenses to pay some form of support for the minor child during this time period. . . . Additionally, the Court finds that [Mother] smokes cigarettes and that she could have paid some form of support for the minor child at issue in this matter instead of buying cigarettes.

The proof in the record supports the trial court's conclusion, by clear and convincing evidence, that Mother abandoned Child by failing to pay any support during the relevant time period. Mother failed to carry her burden of proving her defense that the failure to support was not willful. Consequently, we must affirm the trial court's finding that this ground was proven.

### C. Best Interests of Child

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c). "[A] finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). This is because our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The focus of the best interest analysis is not the parent but the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

Tennessee Code Annotated section 36-1-113(i) provides nine factors for analyzing best interests:

16

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id*. "The relevancy and weight to be given each factor depends on the

17

unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

As a preliminary matter, Mother argues that her rights were violated because she was not put on notice that the issue of whether termination of her rights would be in Child's best interests would be tried. This is primarily because the petition for termination did not specifically make a best interests allegation. However, at trial, both parties made arguments and presented proof with specific reference to the best interests of Child. Mother admits that she made no objection at trial on the ground that she was not provided adequate notice, but she argues that there was such plain error involving a substantial right that we should reverse the trial court's decision notwithstanding her failure to object. Her argument is unpersuasive because the trial transcript shows that her attorney was clearly aware that the best interests of Child were at issue. In his opening statement, he said, "we would also argue that there's not clear and convincing evidence for best interest." In the middle of trial, Mother's counsel lodged an objection on the ground that the proffered evidence was not pertinent to the issue of best interests. In his closing statement, he stated, "I honestly believe that there's not clear and convincing evidence to terminate regarding best interest."

The trial court found as follows regarding Child's best interests:

In determining that it is in the best interest of the minor child to terminate the parental rights of Mother, the Court further finds pursuant to Tennessee Code Annotated § 36-1-1 13[:]

(1) that Mother has not made any adjustments to her lifestyle to make a safe and stable place for the minor child to reside and that even though she testified about her current residence, there is no other proof that this is a safe and stable environment for the minor child. Additionally, Mother still has outstanding criminal charges, which were incurred after the filing of the herein Petition, which supports that she does not have a safe and stable environment for the child;

(2) that there were no services provided by any social services department in this matter so this factor is not relevant in the Court's determination;

(3) that Mother has failed to maintain regular visits with the child as herein found by the Court;

18

(4) that Mother has failed to establish a meaningful relationship with the minor child and the Court further finds that even though Mother testified that she had bonded with the child during the first year of his life, the minor child had to have extensive dental work performed after Petitioner received custody of him so the Court finds that Mother did not form a meaningful relationship with the child during that time in that she was not able to properly care for the child;

(5) that the effect of a change of caretaker at this time, should the minor child be removed from the Petitioner's home, would impact the child negatively in that the Petitioner's home is the only home he knows and that the removal of the child from this home would be a major negative change to the minor child;

(6) there was no testimony regarding whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household, so this issue is not relevant to the Court's determination;

(7) that there has been no testimony regarding any safety issues in Mother's residence aside from her outstanding criminal charges in Knox County, but the Court finds that the issue is removing the minor child from the home he knows at this time and the impact that a change in environment would have on the child;

(8) that there was no testimony regarding Mother's mental or emotional status and the impact which it may have on the minor child. However, there was testimony that Petitioner has never been arrested, has never had any substance abuse issues, and has never had any mental health issues in comparison to Mother, who was arrested numerous times prior to the filing of this Petition and has pending criminal charges in Knox County of the same type as were incurred by her previously; and

(9) that there has been failure of the Mother to pay child support for the benefit of the minor child. Based on the foregoing, the Court finds by clear and convincing evidence that termination of the parental rights of Mother is in the best interests of the minor child.

(Mother's name in original replaced with "Mother" throughout).

19

Our review of the best interests analysis begins with an undisputed fact of large significance and consequence: the last time Mother had any contact or interaction with Child was April 27, 2017. At that point, Child was roughly one year and four months old. It is therefore impossible to say that "a meaningful relationship has otherwise been established between" Mother and Child. Tenn. Code Ann. § 36-1-113(i)(4). We have frequently observed that "[a]n absence of contact between a parent and child for an extended period of time can lead to, in effect, the 'death' of the relationship." *In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *4 (Tenn. Ct. App. Oct. 23, 2019) (citing *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *16 (Tenn. Ct. App. June 16, 2011)); *In re Jude M.*, 2020 WL 6233742, at *17. "This is particularly true for a child . . . who was four years old at the time of trial and had not seen Mother since his first birthday." *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *8 (Tenn. Ct. App. Mar. 12, 2015).

Regarding whether Mother "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in [her] home," Tenn. Code Ann. § 36-1-113(i)(1), and "whether there is criminal activity in the home," *id.* § 36-1-113(i)(7), we note, as did the trial court, Mother's history of criminal activity and resulting charges and incarceration. As already noted, Mother served at least two jail terms while this litigation was pending. Mother testified that she had been charged with two counts of aggravated burglary and theft under $1,000; fraudulent use of a credit card; two counts of identity theft; three driving offenses; and "a computer offense under a thousand dollars." Some of these charges were still pending at the time of the trial in this case. Thus, Mother admitted that "from the time [Petitioner] obtained legal custody of [Child, she] continued to pick up criminal charges." Such circumstances obviously make it difficult to responsibly raise a child.

Petitioner intends to adopt Child after this litigation is concluded. She testified about Child's living arrangements, activities, education, and family circumstances, stating that "he's happy, stable, and safe." Child appears to be mentally and physically healthy in Petitioner's care. Petitioner testified that shortly after she gained custody of Child, he had to have surgery at a children's hospital to have nearly all of his teeth capped because of "extensive decay in his mouth from too much exposure to sugar at an early age." Petitioner said that Child has developed a close relationship with her older daughter, who also lives with them and who was sixteen years old at time of the trial. Considering factor (5) of the best interests analysis, "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition," we conclude that uprooting Child from the only home and family he can remember would likely be detrimental to his condition. Regarding factors (3) and (9), as already discussed, Mother has not maintained regular visitation, nor has she financially supported Child, so these factors weigh in favor of termination. In summary, we affirm the trial court's ruling that

20

the evidence clearly and convincingly establishes that termination of Mother's parental rights is in Child's best interests.

## V. CONCLUSION

The judgment of the trial court finding that Mother abandoned Child by willfully failing to visit is reversed. The trial court's judgment is in all other respects affirmed. Costs on appeal are assessed to Appellant, Melissa V., for which execution may issue, if necessary.

_____
KRISTI M. DAVIS, JUDGE